

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

*610 Federal Plaza*
*Central Islip, New York 11722-4454*

July 24, 2019

<u>By Hand and ECF</u>

The Honorable Arthur D. Spatt
Senior United States District Judge
United States District Court
Eastern District of New York
1020 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Brian Callahan
      <u>Criminal Docket No. 13-453 (ADS)</u>

Dear Judge Spatt:

  The government writes to oppose the above-referenced defendant's July 23, 2019 motion for bail pending resolution of his habeas petition pursuant to 28 U.S.C. § 2255 petition. As set forth below, the standard for bail pending disposition of a habeas petition is a demanding one and the defendant does not remotely come close to meeting it. Accordingly, his request for bail should be denied without a hearing.

STATEMENT OF FACTS

I. <u>Overview of the Investigation</u>

  Between 2005 and 2012, Callahan operated a large-scale Ponzi scheme. (PSR ¶¶ 8, 10-35, 39.) Callahan took more than $100 million from dozens of investors purportedly to invest in hedge funds, stocks, bonds and other investment vehicles. (<u>Id.</u>). However, unbeknownst to investors, Callahan used those funds to pay redemptions to prior investors, to pay himself $6 million, and to purchase and renovate the Panoramic View, a cooperative development in Montauk, New York in which he, personally, had a 50% ownership interest. (<u>Id.</u>). Callahan's criminal conduct caused his investors to lose more approximately $19.7 million. (<u>Id.</u>).

During his fraudulent scheme, Callahan employed numerous deceitful tactics to keep his Ponzi scheme afloat. (PSR ¶¶ 26-35). Indeed, he created fictitious documents that he provided to investors, auditors and banks, including fictitious account statements, balance sheets, closing statements and promissory notes. (Id.). He also forged people's signatures. (PSR ¶¶ 27-28). He even stole a person's identity to conceal his misuse of investor monies from the auditors. (PSR ¶ 27).

For this, a grand jury sitting in the Eastern District of New York returned a 19-count indictment charging Callahan with securities fraud, wire fraud, conspiracy to commit securities fraud, conspiracy to commit wire fraud and aggravated identity theft.

II.   Callahan's Guilty Plea

  A.   The Plea Agreement

On April 29, 2014, Callahan pleaded guilty, pursuant to a plea agreement, to securities fraud and wire fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343, respectively. (A copy of the plea agreement is attached hereto as Exhibit 1). Paragraph 2 provided the government's estimate of the applicable United States Guidelines, including a loss enhancement of more than $50,000,000 but less than $100,000,000, resulting in a Guidelines range of imprisonment of 235 to 293 months. (Id.). Paragraph 3 of the plea agreement explained:

> The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

(Exh. 1 ¶ 3). Callahan agreed "not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 327 months or below." (Id. ¶ 4). Furthermore, Callahan agreed that "[t]his waiver is binding without regard to the sentencing analysis used by the Court." (Id.).

In exchange, the government agreed (1) to dismiss the remaining counts in the indictment, (2) not to bring further criminal charges against Callahan for his defrauding investors, auditors, banks and the Internal Revenue Service, (3) to take no position concerning where within the Guidelines range determined by the Court the sentence should fall, and (4) to make no motion for an upward departure under the Guidelines. (Exh. 1 ¶ 5).

B.      The Presentence Investigation Report ("PSR")

The United States Probation Department ("Probation") prepared and submitted the PSR on December 16, 2015. Probation concluded that Callahan's advisory Guidelines offense level was 40 and he was a criminal history category I, resulting in a range of imprisonment of 292 to 365 months. (PSR ¶¶ 45-57, 90). This offense level was calculated using a base offense level of seven (U.S.S.G. § 2B1.1(a)(1)), adding twenty-six levels because Callahan was running a Ponzi scheme, took more than $100 million from investors during that scheme and therefore intended to cause that much loss (U.S.S.G. § 2B1.1(b)(1)(N)), adding two levels because Callahan victimized ten or more people (U.S.S.G. § 2B1.1(b)(2)(A)), adding four levels because Callahan was an investment advisor (U.S.S.G. § 2B1.1(b)(17)(A)(iii)), adding two levels because Callahan employed sophisticated means (U.S.S.G. § 2B1.1(b)(10)), adding two levels for being an organizer, leader, manager or supervisor (U.S.S.G. § 3B1.1(c)), and subtracting three levels for timely acceptance of responsibility (U.S.S.G. §§ 3B1.1(a), (b)). (PSR ¶¶ 45-57).

Callahan raised three objections to Probation's calculation. For purposes of the present motion, the only relevant objection is Callahan's objection to the loss enhancement, which he claimed was at most $2.7 million.

The government also objected to Probation's loss figure. Rather than holding Callahan accountable for his intended loss (i.e., all the monies he took from investors during his Ponzi scheme), the government argued that the loss enhancement should be limited to the actual loss that Callahan's criminal conduct caused. As a result, the government deducted the redemptions Callahan paid to prior investors and monies that the government recouped when it sold all the seized assets and what remained was a $19.7 million loss, resulting in a Guidelines range of imprisonment of 151 to 188 months.

On September 14, 2017, Probation issued an addendum reducing the loss enhancement to $19.7 million. (PSR Add. ¶ 46).

C.      Sentencing

Prior to sentencing hearing, Callahan submitted a sentencing memorandum, dated September 5, 2017, requesting a sentence of one year and a day. The government submitted a sentencing memorandum, dated September 13, 2017, asking the district court to impose a Guidelines sentence, namely, a sentence between 151 and 188 months.

On September 15, 2017, Callahan appeared for sentencing. (A copy of the transcript from Callahan's sentencing is attached hereto as Exhibit 2, at 2-3). After hearing extensive arguments from defense counsel and the government regarding the appropriate loss calculation, Your Honor rejected Callahan's argument and agreed with the government and Probation that Callahan caused $19.7 million in loss. (Id. at 11-13, 15, 44-46, 62). After also allowing Callahan's father, his wife, a family friend, defense counsel, Callahan, the

government and several victims to be heard regarding the appropriate sentence to be imposed, the Court sentenced Callahan to 144 months' incarceration.  (Id. at 8-66).

In pronouncing sentencing, Your Honor first considered the Guidelines range of 151 to 188 months, acknowledging that while the Court must consider the Guidelines, those Guidelines were not mandatory.  (Id. at 62-63).  Next, the Court examined the factors set forth in 18 U.S.C. § 3553(a) and described the "nature and circumstances of the offense" as a "major fraud, one of the worst", "a very serious offense" and "despicable conduct."  (Id. at 63, 64).  Specifically, the Court explained

> [B]etween 2005 and 2012, this defendant created and maintained multiple offshore investment funds for which he solicited investors. . . . He set up all of these funds and got investors to put money into it, with the expectation that they would invest the funds in various projects, hedge funds, etc., and that they, the people who invested the money, would be paid, plus interest.
>
> However, in October 20006, the defendant and his brother-in-law agreed to purchase the Panoramic View, a cooperative in Montauk. . . .  He obtained a $35 million acquisition loan and also money from the ventures.
>
> He used approximately $14 million in funds from the ventures, and during this time, he never said a word to the investors about this.  He continued to solicit investments.  He lied to the people involved.  He lied to the Montauk Fire Department about how the money was invested, I believe it was $600,000 that the Montauk Fire Department invested.  No mention of unauthorized diversion of the monies.
>
> The defendant also depleted monies for his personal expenses, and other fraudulent purchases in the sum – I hear various amounts, but approximately $3 million, and he continued to solicit new investors right along.
>
> He continued to send fraudulent account statements with regard to these investments that did not exist.  Investors were told they could redeem on demand.  That was false, because he had no funds left to redeem.
>
> He was unable to provide correct information to his accountants.  He gave them fraudulent information.

> He sent out fraudulent balance sheets . . . This deceit, this fraudulent conduct went on and on. . . .
>
> The defendant took more than a hundred million dollars from investors and used these monies to pay redemptions to other investors, his own personal use, and buying this resort. He lied to these investors for more than seven years.

(Id. at 59-61, 65).

The Court then considered the "history and characteristics of the defendant," explaining that

> [Callahan] has no criminal history, but he had another problem besides this. When he worked at a company called Rochdale, his last employer before he began this fraudulent scheme, he engaged in some of the fraudulent conduct. He forged and fabricated documents, engaged in private securities transactions without providing those to Rochdale, failed to respond to a request by a government body in charge called the Financial Industry Regulatory Authority. FINRA requested documents from him, but he didn't respond. And based on this conduct, in June 2009, FINRA barred the defendant from associating with any FINRA member, a fact that the defendant did not share with his now present investors, never told them anything about that one.

(Id. at 62, 63-64).

The Court next addressed the need for its sentence "to promote respect for the law" asking "[w]hat respect for the law did this defendant have in cheating and stealing and lying to these people?" (Id. at 64).

The Court then explained that its sentence reflected the need to protect the public from future crimes of the defendant and to afford adequate general and specific deterrence. (Id.). In fashioning a just sentence, Your Honor credited some of Callahan's mitigating arguments, including his failed attempts at cooperation and the business that his wife started after Callahan was arrested. (Id. at 65-66).

The Court also ordered Callahan to begin serving his sentence on November 27, 2017. (Id. at 78). Eight days before he was ordered to start serving his sentence and more than 60 days after sentencing, for the first time, Callahan asked the Court to postpone his surrender date. The Court rejected that request. The next day on November 20, 2017, Callahan moved for bail pending appeal. Your Honor denied that motion.

D.     Appeal

The defendant filed a notice of appeal arguing the government changed its theory of loss, and also appealed Your Honor's rejection of his motion for bail pending appeal. The government moved to dismiss the defendant's appeal. On December 28, 2017, the Second Circuit dismissed the defendant's appeal on the ground that the defendant waived his right to appeal if he received a sentence of imprisonment of 327 months or below and found that the motion for bail was moot. (A copy of the Second Circuit's decision is attached hereto as Exhibit 3).

In January 2018, the defendant began serving his sentence.

ARGUMENT

CALLAHAN IS NOT ENTITLED TO BAIL

I.     Legal Standard

The standard governing a defendant's release or detention pending appeal is set forth in 18 U.S.C. § 3143, a statute that creates a presumption that a defendant who has received a sentence of imprisonment will be detained pending appeal. See United States v. Randell, 761 F.2d 122, 124-25 (2d Cir. 1985). This presumption is based upon Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances." United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H.Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)). Section 3143 puts a heavy burden of proof squarely on the defendant, requiring that a defendant be detained unless he or she proves that certain criteria are met. See generally Randell, 761 F.2d at 125; Miller, 753 F.2d at 24; see also United States v. Abuhamra, 389 F.3d 309, 317 n. 5 (2d Cir.2004) (noting "the heavier burden imposed by 18 U.S.C. § 3143(b)" compared to release pending sentencing under § 3143(a)).

Where a defendant has been found guilty and sentenced to a term of imprisonment, the court should order detention pending appeal unless the court finds: (1) by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community; and (2) the appeal is not for the purpose of delay and raises a substantial question of law or fact, and (3) that, if the substantial question is answered in the defendant's favor, it is likely to result a sentence that is less than the time served plus the expected duration of the appeal process. See 18 U.S.C. § 3143(b); Randell, 761 F.2d at 125. A "substantial question" under Section 3143 is one that is "integral to the merits of the conviction" and "of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." Randell, 761 F.2d at 125 (citation omitted).

Bail pending habeas, or a request for bail following a conviction that has been affirmed on appeal, is not mentioned in the Bail Reform Act. Rather, bail pending habeas is based on the inherent power of the federal courts. See, e.g., Mapp v. Reno, 241 F.3d 221, 226 (2d Cir. 2001). However, consistent with the notion that courts are acting pursuant to their inherent power and not pursuant to statute, the Second Circuit has made clear that "this power is a limited one, to be exercised in special cases only." Id. Thus, "[t]he standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." Grune v. Coughlin, 913 F.2d 41, 44 (2d Cir. 1990) (internal quotation marks omitted) (alterations in original).

Courts have recognized that the standard for bail pending habeas is even higher than the standard for release pending appeal following a conviction. See, e.g., United States v. Whitman, 153 F. Supp. 3d 658, 660 (S.D.N.Y. 2015) ("[A]s this Court and others in this District have held, the standard for release on bail under 18 U.S.C. § 2255 is even higher than under 18 U.S.C. § 3143(b).") Such a higher standard makes sense; after all, the conviction has already been affirmed on appeal. As part of this higher standard, release on bail pending habeas requires "a demonstrated likelihood that the petition will prevail, based upon claims of a substantial nature upon which the petitioner has a high probability of success . . . so that victory for petitioner can be predicted with confidence." Id. Moreover, release on bail pending habeas also requires that the petitioner show "extraordinary circumstances" to obtain "such exceptional relief." Id. at 661.

The burden falls on the petitioner seeking relief to demonstrate both the "substantial questions" and the "exceptional circumstances" required. Swerbilov v. United States, No. 04-CV-3320, 2005 WL 1177938, at *2 (E.D.N.Y. May 18, 2005).

II.   The Defendant Does Not Raise a Substantial Question That Has a High Probability of Success, Nor Does He Demonstrate Extraordinary Circumstances

Here, Callahan falls far short of meeting either prong of the demanding bail standard. First, Callahan cannot demonstrate that his habeas petition raises "substantial questions" upon which he has a "high probability of success." As will be discussed in more detail in the government's opposition to the defendant's habeas petition, none of Callahan's claims raise a substantial question, much less a meritorious claim. Notably, the Court need not decide the habeas petition on the merits in order to reject Callahan's request for bail. Other courts have rejected such claims prior to reaching the merits. See, e.g., Beras v. United States, No. 05-CV-2678, 2012 WL 2148986, at *1 (S.D.N.Y. June 12, 2012) ("Although the Court does not yet decide the merits of the habeas petition, the Court finds that the Petitioner has failed to demonstrate a likelihood that the petition will prevail. Accordingly, the Court denies the motion for bail.").

Second, Callahan cannot demonstrate extraordinary circumstances justifying his release on bail. He is in the same position as most other habeas petitioners seeking relief

from convictions that they believe are improper:  He has been convicted, his conviction has been affirmed on appeal, and he has raised ineffective assistance claims by way of a habeas petition.  The Court can reach the merits of that petition while Callahan remains in custody.  Callahan has been in custody for approximately 1½ years and still has approximately nine years left to serve.  The mere fact that he remains in custody during the pendency of the habeas petition is not an extraordinary circumstance.  See Iuteri v. Nardoza, 662 F.2d 159, 162 (2d Cir. 1981) (rejecting petitioner's contention that his case was extraordinary because "if the habeas writ is granted, it will mean that his incarceration . . . would have been without basis" and holding that "there is nothing unusual about this"); Harris v. United States, No. 97-CV-1904, 1997 WL 272398, at *1 (S.D.N.Y. May 21, 1997) ("The fact that [petitioner's] post-petition incarceration will have been without just basis if his petition eventually succeeds does not constitute an extraordinary circumstance entitling him to bail.").

The Court sentenced the defendant to 144 months based on a careful examination of the Section 3553(a) factors.  Were the Court to be required to resentence the defendant—which is highly unlikely—there is no legitimate reason to believe that the Court would impose a sentence of time served (i.e., 1½ years' incarceration).  As set forth above, even a cursory review of the offense conduct and the defendant's history supports a significant term of incarceration.  For approximately seven years, the defendant abused his position of trust as an investment advisor to convince dozens of unsuspecting investors to part with their hard-earned money for what they believed were strong, well-performing investments.  In reality, the defendant was running a massive Ponzi scheme.  The defendant went to great lengths to execute his fraud.  He lied to investors.  He lied to the auditors.  And he lied to the bank.  He also employed every trick in the fraudster book.  He created completely fake documents.  He forged people's signatures.  And he even stole a person's identity.  Despite that the defendant has no criminal history, this was not the first time that the defendant engaged in fraudulent conduct.  When he worked at Rochdale—his last employer before he began the instant fraudulent scheme—he engaged in some of the same fraudulent conduct as here.  This obviously did not deter the defendant from forging and fabricating documents and perpetrating a significant fraud; in fact, this experience with FINRA brings into view the recidivist nature of the defendant's crime.  For these reasons and other reasons announced at the sentencing hearing, the Court sentenced the defendant to a term of imprisonment of 144 months.

Finally, as set forth above, the government notes that following Callahan's conviction and prior to his appeal, Callahan was unable to meet the standard for release pending appeal, as Your Honor denied his motion for bail pending appeal.  The defendant appealed that decision.  Significantly, the Second Circuit found that the motion for bail was moot after it dismissed the defendant's appeal.  Thus, where Callahan was unable to meet the lesser standard for bail pending appeal, he cannot meet the even more stringent standard for bail pending habeas.

## CONCLUSION

        For all of the reasons set forth herein, the defendant's motion for bail pending the disposition of his habeas petition should be denied.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/
      Christopher Caffarone
      Assistant U.S. Attorney

cc:    Andrew Frisch, Esq. (Via ECF and Email)