**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
UNITED STATES OF AMERICA,

        -against-

BRIAN R. CALLAHAN and
ADAM J. MANSON,

              Defendants.
--------------------------------------------------------X

**FILED**
**CLERK**

3:34 pm, Jan 09, 2020

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION & ORDER**
2:13-cr-00453 (S-1)(ADS)

**APPEARANCES:**

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the United States*
610 Federal Plaza
Central Islip, NY 11722
      By:    Christopher Charles Caffarone, Assistant United States Attorney,

271 Cadman Plaza East
Brooklyn, NY 11201
      By:    Alicyn L. Cooley, Assistant United States Attorney,
              Brian D. Morris, Assistant United States Attorney,
              Karin K. Orenstein, Assistant United States Attorney,
              Shannon Cassandra Jones, Assistant United States Attorney, Of Counsel.

**Andrew James Frisch, Esq.,**
*Attorney for the Defendants*
One Penn Plaza Suite 5315
New York, NY 10119

**SPATT, District Judge**:

       Defendants Brian R. Callahan ("Callahan") and Adam J. Manson ("Manson") (collectively, the "Defendants") pleaded guilty, pursuant to plea agreements, to crimes relating to the operation of a large-scale Ponzi scheme. The Court sentenced Callahan to 144 months incarceration, which he began serving in January 2018. Manson's sentencing hearing is upcoming.

Presently before the Court are several motions by the Defendants pertaining to their sentencing, namely: (1) a motion by Callahan to vacate his sentence pursuant to 28 U.S.C. § 2255; (2) a motion by Manson to compel specific performance by the Government of his plea agreement; (3) a motion by Manson to disqualify the United States Attorney's Office for the Eastern District of New York, in favor of prosecution by another United States Attorney's office; and (4) a motion by Manson to preclude Jerry Ostry ("Ostry"), a victim, from testifying at his sentencing hearing.

For the following reasons, the Court denies the Defendants' motions in their entirety, except it will permit the cross-examination of Ostry by defense counsel at Manson's sentencing hearing.

## I. BACKGROUND

Between 2005 and 2012, Callahan operated a large-scale Ponzi scheme. He took money from investors purportedly to invest in hedge funds, stocks, bonds and other investment vehicles. However, unknown to investors, Callahan used those funds to pay redemptions to prior investors; to pay himself $6 million; and to purchase and renovate the Panoramic View, a cooperative development in Montauk, New York, for the sum of $38 million, in which he, personally, had a 50% ownership interest.

Manson, Callahan's brother-in-law, assisted Callahan in carrying out the scheme by, among other things, handling the purchase of the Panoramic View with investor money; lying to banks in connection with that transaction; and lying to auditors in order to enable Callahan to continue defrauding investors.

For their conduct, a grand jury sitting in the Eastern District of New York on July 31, 2013 returned a 19-count indictment charging Callahan and Manson variously with securities

fraud, wire fraud, conspiracy to commit securities fraud, conspiracy to commit wire fraud and aggravated identity theft.

On April 29, 2014, Callahan pleaded guilty, pursuant to a plea agreement, to securities fraud and wire fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343, respectively. Paragraph 2 provided the Government's estimate of the applicable United States Sentencing Guidelines (the "Guidelines"), including a loss enhancement of more than $50,000,000 but less than $100,000,000, resulting in a Guidelines range of imprisonment of 235 to 293 months. In exchange, the Government agreed (1) to dismiss the remaining counts in the indictment, (2) not to bring further criminal charges against Callahan for his defrauding investors, auditors, banks and the Internal Revenue Service, (3) to take no position concerning where within the Guidelines range determined by the Court the sentence should fall, and (4) to make no motion for an upward departure under the Guidelines.

On May 12, 2014, Manson pleaded guilty, pursuant to a plea agreement, to one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Similar to Callahan, Manson's plea agreement included, as part of its Guidelines estimate, a loss enhancement of more than $50,000,000 but less than $100,000,000, resulting in an estimated Guidelines range of imprisonment of 121 to 151 months imprisonment. However, because the statutory maximum for the offense of conviction was five years imprisonment, the advisory Guidelines range became 60 months.

On December 16, 2015, the United States Probation Department ("Probation") prepared and submitted the Presentence Investigation Report ("PSR"). Probation concluded that Callahan's advisory Guidelines offense level was 40 and he was in criminal history category I, resulting in a range of imprisonment of 292 to 365 months. Probation used Callahan's intended

loss of $118.7 million as its benchmark for calculating the loss amount applicable to the scheme, ECF 181 ¶ 39, a decision that resulted in a higher advisory Guidelines range than what had been estimated in Callahan's plea agreement.

On September 5, 2017, ten days prior to sentencing, Callahan raised three objections to Probation's calculation.

On September 13, 2017, the Government filed a response to Callahan's sentencing submission, which, in relevant part, objected to Probation's loss figure:

> Probation holds the defendant accountable for all the money that he took from investors—more than $100 million--on the theory that he was running a Ponzi scheme and therefore intended to cause that much loss. (PSR ¶ 39.) While that theory is viable, the government has decided to take a more conservative approach and will use the actual loss that the defendant caused. After giving the defendant credit for (1) net proceeds from the sales of the Panoramic and 47 Clock Tower, (2) investor monies recovered by the Receiver in the SEC action, (3) any legitimate market losses and (4) redemptions paid to investors, the government concluded that the defendant caused $19.7 million in loss--this is for Guidelines purposes only, the amount of restitution is $67.6 million. The government calculated the actual loss as follows:

| | |
|---|---|
| Total money received from investors | $140.6 million |
| Redemptions paid to prior investors | $74 million |
| Monies recovered by the Receiver | $6.4 million |
| Net proceeds from sale of 47 Clock Tower | $139 thousand |
| Net proceeds from the sale of the Panoramic | $40.3 million |
| *Actual Loss* | $19.7 |

ECF 158 at 3.

Following the filing of the Government's sentencing letter, on September 14, 2017, Probation issued an addendum to the PSR reducing the loss enhancement to $19.7 million.

On September 15, 2017, Callahan appeared for sentencing. After hearing extensive arguments from defense counsel and the Government regarding the appropriate loss calculation, the Court rejected Callahan's argument and agreed with the Government and Probation that

Callahan caused $19.7 million in loss. The Court then permitted Callahan's father, his wife, a family friend, defense counsel, Callahan, the Government and several victims to be heard regarding the appropriate sentence to be imposed. The Court examined each of the factors set forth in 18 U.S.C. § 3553(a), and sentenced Callahan to 144 months incarceration—a variance below the applicable advisory Guidelines range of 151 to 188 months.

Callahan appealed from the Court's judgment and challenged his sentence, arguing, among other things, that the Government changed its theory of loss in violation of his plea agreement. On December 28, 2017, the Second Circuit dismissed Callahan's appeal on the ground that his 144 month sentence barred an appeal under the waiver of appellate rights for sentences of 327 months or below in his plea agreement.

On September 28, 2018, Callahan filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255.

On June 19, 2019, the Defendants filed a motion seeking (1) an order disqualifying the United States Attorney's Office from prosecuting this case; (2) recusal of the undersigned; (3) an order requiring enforcement of Manson's plea agreement; (4) permission to supplement Callahan's September 28, 2018 motion to vacate; and (5) Callahan's immediate release on bond.

On July 31, 2019, the Court denied the Defendants' motion for recusal and Callahan's motion for bail pending *habeas* review, which the Second Circuit affirmed on October 9, 2019.

## II. DISCUSSION

### A. AS TO WHETHER THE GOVERNMENT BREACHED THE PLEA AGREEMENTS.

Although both defendants pleaded guilty, the procedural posture of their cases is different. The Court has already sentenced Callahan, who lost his appeal and now seeks *habeas* relief. The Court has not yet sentenced Manson. Consequently, Manson's claim is one that the

Government will breach his plea agreement at his upcoming sentencing, whereas the alleged breach of Callahan's agreement has already occurred. Those agreements provided for an estimated loss enhancement at sentencing of more than $50,000,000 but less than $100,000,000, resulting in a Guidelines range of imprisonment of 235 to 293 months for Callahan, ECF 196-10 ¶ 2, and 121 to 151 months for Manson, ECF 206-6 ¶ 2.

At Callahan's sentencing, Probation calculated an estimated loss of $118.7 million, by holding him accountable for all of the money received from investors, a figure representing the total intended loss. The Government objected that Callahan should only be responsible for $19.7 million in losses, representing the actual losses caused by his scheme, resulting in an applicable Guidelines range of 151 to 188 months. ECF 158 at 3. With respect to Manson's upcoming sentencing, the Government intends to apply the same loss calculation.

Despite the procedural disparity, the Defendants presented their arguments through a joint motion, most likely in an attempt to bootstrap Callahan's motion to vacate to the timing of Manson's sentencing hearing. In many instances, it is not readily apparent from the Defendants' submissions which arguments pertain to Callahan's motion to vacate and which ones relate to Manson's upcoming sentencing. Given the Government's representation that it advocates using the same estimate of loss at Manson's sentencing, the Court will conclusively resolve each challenge to the Government's stance as if it applies to both defendants, rather than attempting to parse through each of Callahan and Manson's individual accusations. To that end, the Court will henceforth describe whether the Government breached the Defendants' agreements collectively, even though Manson's sentencing has not yet occurred.

As the Court will explain, the Government's estimated fraud loss is entirely consistent with the Defendants' plea agreements.

"[B]ecause plea bargains require defendants to waive fundamental constitutional rights, prosecutors are held to meticulous standards of performance." *United States v. Vaval*, 404 F.3d 144, 152–53 (2d Cir. 2005). Courts are to "construe plea agreements strictly against the government and do not 'hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness.'" *Id.* at 152 (quoting *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999)).

Determining whether the government breached a plea agreement turns on what "the reasonable understanding and expectations of the defendant [was] as to the sentence for which he had bargained." *Paradiso v. United States*, 689 F.2d 28, 31 (2d Cir. 1982). In doing so, the Court "look[s] both to the precise terms of the plea agreements and to the parties' behavior." *United States v. Wilson*, 920 F.3d 155, 163 (2d Cir. 2019). When the alleged breach of a plea agreement involves a sentencing estimate, the Court must resolve the tension between, on one hand, "defendants' reasonable reliance on the sentences as estimated in their plea agreements, and, on the other, the Government's need to maintain flexibility in its sentencing decisions in the event of mistakes, oversights, or new information." *Id.* Thus, the Court must avoid overly focusing on "technical distinctions in semantics." *Gammarano v. United States*, 732 F.2d 273, 276 (2d Cir. 1984).

"[T]he Government does not violate a defendant's reasonable expectations simply because it deviates from the estimate." *Wilson*, 920 F.3d at 163. However, a defendant's reasonable expectations may be breached where the Government's deviation "produce[s] serious unfairness" for the defendant. *United States v. Habbas*, 527 F.3d 266, 271 (2d Cir. 2008). This may occur if, for instance, the Government acts in bad faith (either in its initial calculation of the *Pimentel* estimate or in its later change of position) or if "the [G]overnment's change of position

(without new justifying facts) changed the defendant's exposure so dramatically as to raise doubts whether the defendant could reasonably be seen to have understood the risks of the agreement." *Id.*

Here, the $19.7 million loss figure advocated by the Government is ***below*** the $50 to $100 million range contemplated by the Defendants' plea agreements and in no way violates the Defendants' reasonable expectations. If the Government departed from those expectations, it was substantially to the Defendants' benefit. The Government adopted a loss estimate more conservative than the PSR, resulting in Guidelines ranges with shorter terms of imprisonment than the parties' agreed upon estimate. ECF 223 at 4 ("On its face, to the extent this approach differed from Callahan's reasonable expectations based on the plea agreement, that difference redounded to the defendant's benefit. It lowered his Guidelines range from 235 to 293 months to 151 to 188 months.").

According to the Defendants, the Government's stance represented a dramatic reversal in its characterization of the loss caused by their conduct. The Government previously characterized the value of the fraud as $96 million. At sentencing, the Government derived its $19.7 million loss figure by estimating that Callahan received $140.6 million from investors, thereby allegedly adding $44.6 million in unexpected losses to the enhancements advocated. In the Defendants' view, if the Government based its calculations on the previously articulated $96 million fraud value, then, after applying credits for the value of the redemptions returned to the defrauded, the loss enhancement for their conduct would be $0. Thus, Callahan would not have been sentenced to a term of imprisonment and Manson would similarly escape imprisonment at his upcoming sentencing.

The Court finds that the Defendants' argument is confused, at best, and misleading, at worst. As an initial matter, it is precluded by the plea agreements themselves. Paragraph 3 explains:

> The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

ECF 196-10 ¶ 3; ECF 206-6 ¶ 3.The Defendants read and signed the plea agreements. ECF 196-10 at 11; ECF 206-6 at 11. During the plea proceedings, the Court informed the Defendants, among other things, of the statutory penalties. ECF 222-2 at 9–10, 12–13. In response, the Defendants assured the Court that they had reviewed the plea agreements with their attorneys, that they understood the agreements, and that no promises had been made to them other than those contained in the plea agreements. *Id.* at 9, 18.

Therefore, even before addressing the substance of the Defendants' theory, it is apparent that they had no reasonable expectation that they would receive the particular sentence they desired in light of the plea agreements' reservation that the Government may revise its estimate "for any reason." *See United States v. Enriquez*, 42 F.3d 769, 773 (2d Cir. 1994) (finding government could seek upward adjustment based on facts known at the time of plea agreement because the parties "expressly left themselves free to argue even for positions that were directly inconsistent with the estimate set forth in the agreement"); *Almanzar v. United States*, No. 10-cv-1307, 2013 WL 5525703, at *7 (E.D.N.Y. Sept. 30, 2013) ("Petitioner was aware of actual sentencing possibilities and the fact that neither Probation nor the Court was bound by the plea agreement. Thus, Petitioner's argument that he was not provided with notice that he would be classified as a career criminal until he received the PSR is unavailing."); *MacPherson v. United*

*States*, No. 10-cv-4768, 2012 WL 3288475, at *7 (E.D.N.Y. Aug. 9, 2012) (finding Government did not breach plea agreement by advocating upward departure from estimate where "the plea agreement and the court's colloquy with petitioner at the time he pled guilty put petitioner on notice that the estimate was not binding on the prosecutor, Probation or the court and that the plea could not be withdrawn if the estimate was wrong"); *Valencia-Lopez v. United States*, No. 10-cv-02893, 2012 WL 2160967, at *10 (E.D.N.Y. June 13, 2012) (finding Government did not breach plea agreement by advocating higher drug quantity at sentencing because "the Government made no assurance that it would not advocate for a sentence higher than its estimate").

Substantively, the Defendants' argument conflates a generic description of the amount of money investors put in the Ponzi scheme with the formula for calculating fraud loss articulated by the Guidelines. The actual language of the plea agreements provided for an additional 24 levels of enhancement due to a "Loss amount of more than $50,000,000 (§ 2B1.1(b)(1)(M))." ECF 196-10 ¶ 2; ECF 206-6 ¶ 2. The loss amount under the Guidelines is a term of art meaning "the greater of actual loss or intended loss." *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(A)). The Government's revised position was "that the loss that the defendant caused is approximately $19.7 million, resulting in a 20-level increase (§ 2B1.1(b)(1)(K))." ECF 158 at 2. In other words, the Government advocated a four level downward departure from the estimate in the plea agreements, so that the conclusion that the Government calculated loss consistent with the agreements is clear.

To the extent that the Guidelines reference the size of a fraudulent investment as a benchmark for assessing loss, it is to communicate that an offending party should be held responsible for the *entirety* of their intended loss. *See* U.S.S.G. § 2B1.1, cmt. n. 3(A)(ii)(I)

("'Intended loss' [ ] means the pecuniary harm that the defendant purposely sought to inflict."). Thus, a court may, for instance, estimate that the intended loss caused by a Ponzi scheme is the total amount of money received from investors. *See United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012) ("The guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested."). Otherwise, the size of the Ponzi scheme is merely a component in the calculation of the actual loss caused by the Defendants. There is nothing in the plea agreements binding the Government to a particular method of calculating loss, as long as the outcome did not exceed $100 million. And the Government indisputably discharged that obligation by communicating that the Defendants only caused $19.7 million in losses, an amount triggering significantly fewer levels of enhancement than the range in the plea agreements.

Tellingly, the plea agreements contained no language providing for additional credits or otherwise supporting the Defendants' assertion that they had an offset in their minds when they pleaded guilty. Indeed, it would be counterintuitive to negotiate a particular estimated loss enhancement, only to then separately agree that those enhancements would be wiped out by credits against that loss. In that regard, the Defendants' interpretation amounts to a proverbial attempt to "double dip" on the plea agreements, by allowing them to benefit from the concessions made by the Government while simultaneously seeking additional credits for redemptions beyond the loss calculations expressly agreed to in the plea agreements. If the parties intended such an outcome, the loss bracket in the plea agreements would have been an amount below $50 million, rather than $50 to $100 million. To permit the Defendants "to escape the fairly bargained-for consequences of [their] agreement with the government would render the

plea bargaining process and the resulting agreement meaningless." *United States v. Monzon*, 359 F.3d 110, 117 (2d Cir. 2004) (describing appellate waivers).

Moreover, none of the evidence cited by the Defendants reasonably supports the conclusion that they were entitled to a different loss calculation. In essence, the Defendants cite several statements where the Government described the size of the Ponzi scheme as $96 million. Nothing about these statements communicated that the Defendants were entitled to offsetting credits on top of the range estimated in the plea agreements – *i.e.*, a loss enhancement of $0. Assuming these statements did convey such a message, they are not reasonable bases for departing from the above-described interpretation of the plea agreements.

For instance, the Defendants cite a paragraph in the indictment stating that: "[b]etween December 2006 and February 2012, CALLAHAN raised approximately $118.7 million in the Audited Callahan Funds, and he misappropriated at least $96 million of those funds." ECF 196-4 ¶ 22. This language is non-exclusive and directly references the possibility that Callahan appropriated more than the $96 million identified in the indictment.

The Defendants also cite various correspondences with defense counsel and the Court, as well as press statements by the Attorney General, obliquely describing the charged conduct as a $96 million Ponzi scheme. ECF 196-8; ECF 196-9. "[A] defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach." *In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999). Assuming those statements supported the Defendants' unreasonable expectation that they would receive no term of imprisonment, they could not override the explicit loss enhancement contained in the plea agreements.

Nor could the Defendants rely on the statements by the Securities Exchange Commission in its civil complaint or by the Government in the forfeiture proceedings. ECF 196-6 ¶¶ 31, 34–

35, 58, 60–61, 66, 71; ECF 196-7 ¶¶ 2, 36–38, 40, 91, 94, 99. The plea agreements were between the Defendants and the Government—the United States Attorney's Office for the Eastern District of New York—and solely pertain to criminal charges against the Defendants. ECF 196-10 ¶ 5; ECF 206-6 ¶. It is not apparent why statements by another agency, which is a regulatory enforcement body, in a civil case would bind the Government in this criminal case. *Cf. United States v. Annabi*, 771 F.2d 670, 672 (2d Cir.1985) ("A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.").

Statements in the civil forfeiture proceeding, ECF 196-5 ¶¶ 24–27, 30, 40, 42, which rely on a totally different standard for calculating loss, are similarly irrelevant. "Restitution serves a compensatory function, and focuses on the victim and the harm proximately caused by the defendant's conduct. Loss under the fraud guideline, by contrast, focuses on the defendant, and seeks, however imperfectly, to measure the seriousness of his or her criminal conduct." *Certified Envtl. Servs., Inc.*, 753 F.3d at 102. Consequently "a defendant's culpability will not always equal the victim's injury," *United States v. Catherine*, 55 F.3d 1462, 1465 (2d Cir.1995), and "an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution," *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir.1998). Necessarily then, the fact that the Government may have offered a different loss estimate in the forfeiture proceeding cannot bind the Government's loss estimates at sentencing, absent express language to that effect in the plea agreements.

Based on these facts, the Government's actions bear no similarity to the cases where courts have vacated a guilty plea due to a change in position at sentencing by the government. In *United States v. Wilson*, 920 F.3d 155 (2d Cir. 2019), the government obtained an adjournment

of the defendant's sentencing for four years while it put his co-defendant on trial. Then, the government attempted to increase the defendant's sentence on the basis of information that, although also established at the trial, had been well-known to the government at the time it negotiated the defendant's plea. *Id.* at 165. In *United States v. Palladino*, 347 F.3d 29 (2d Cir. 2003), the prosecutor who negotiated the plea agreement provided the defendant with a *Pimentel* estimate that excluded a potentially applicable six-point sentencing enhancement. *Id.* at 31. Then, when "a new Assistant United States Attorney [took] over the case and adopted a different view of the matter," the government sought to apply the sentencing enhancement using evidence that the government knew about at the time the plea was negotiated. *Id.* at 34.

In both cases, the government dramatically altered its view of the Guidelines estimate based on information available to it at the time it negotiated the guilty plea, resulting in a sentence dramatically higher than reasonably anticipated. Here, the Government took no stance at sentencing that went beyond the Defendants' reasonable expectations, because the only reasonable interpretation of the plea agreements is that any credits for redemptions to defrauded investors were accounted for in the loss enhancement estimates.

In their reply brief, the Defendants advance some alternative theories supporting their interpretation of the plea agreements. These theories are also unpersuasive.

First, the Defendants argue that the Governments' briefs, and the position ultimately taken by the Court, conflate "loss" with "net loss." As the Court explained, the "loss" articulated by the Defendants is not a cognizable category under the Guidelines. The relevant categories of loss are "intended" loss and "actual" loss. Despite the Defendants' protestation, the Government's decision to seek to hold the Defendants accountable for their "net loss" resulted in a lower contemplated sentence, as using the "intended" loss, at a minimum would have resulted

14

in a loss bracket of $118 million. *See United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012) ("[A]lthough Application Note 3(E)(ii) accurately describes the calculation of *actual* loss, the note cannot be mechanically followed where *intended* loss is higher, since the larger intended amount is a better measure for the defendant's culpability."); *United States v. Bergstein*, No. 18-cr-1966, 2019 WL 4410240, at *2 (2d Cir. Sept. 16, 2019) ("[T]o the extent Weston recovered any of the collateral, the intended loss, which includes the value of the P2 loan, exceeds the actual loss amount and is therefore the appropriate measure of loss.").

Second, the Defendants argue that if the plea agreements were silent as to the application of credits, then the agreements are ambiguous and should be construed against the Government. However, the Second Circuit has explicitly declined "requir[ing] the Government to anticipate and expressly disavow every potential term that a defendant might believe to be implicit in [a] agreement." *Altro*, 180 F.3d at 376. Given the other language in the plea agreements described above, and the absence of an explicit provision as to the credits, the Defendants' subjective and unilateral understanding that they would be entitled to additional credits does not create such an entitlement. *See id.* at 377 ("Altro cannot unilaterally modify the plea agreement to preclude the grand jury subpoena on the basis of an uninduced, mistaken belief that he had bargained for an exemption from all testimony."); *United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir. 2004) ("Lenoci cannot cite any provision in the plea agreement which precludes the government from arguing for the two-level upward adjustment, for there is no such provision. The fact that the government did not seek the multiple bribe enhancement in one context does not preclude it from doing so in another, absent some agreement on the issue.").

Therefore, the Court finds no basis for ruling that the Government violated its agreements with either defendant. With that in mind, the Court must also assess the several bases advanced

by the Defendants why, beyond its alleged contravention of the plea agreements, the Government's articulation of the loss caused was factually or legally erroneous.

First, the Defendants argue that the Government impermissibly included in its estimate money in hedge funds, like Kinetics Advisers, LLC ("Kinetics"), which was not used to advance the fraud and whose losses were caused by the global financial crisis.

As a preliminary matter, the fact that the Defendants never pled guilty for the money in certain funds does not make reference to such behavior impermissible for sentencing purposes. *See* U.S.S.G. §§ 1B1.3(a)(1)(A), 1B1.3(a)(2) (noting that, when making its sentencing determination, a district court may consider all "relevant conduct," which includes "acts and commissions" that "were part of the same course of conduct or common scheme or plan as the offense conviction"). "A district court may consider as part of its sentencing determination uncharged conduct proven by a preponderance of the evidence as long as that conduct does not increase either the statutory minimum or maximum available punishment." *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005).

The Kinetics transactions involved unauthorized diversions of investor money similar to the conduct the Defendants pled guilty to, and thus may be considered as part of the Court's consideration of the overall scheme. *See United States v. Constantine*, 762 F. App'x 16, 19 (2d Cir. 2019) (attributing value of the promissory note to loss calculation even though "the Information to which she pled guilty did not specifically reference the note"); *United States v. Stitsky*, 536 F. App'x 98, 111 (2d Cir. 2013) ("Defendants nevertheless assert that individuals who invested with Cobalt through methods other than purchasing Units are not victims of the charged crimes and, thus, their investments should not be included in the loss amount. This

argument fails because, as discussed supra with respect to defendants' constructive amendment argument, those individuals were, in fact, victims of the fraudulent scheme charged in the indictment."); *United States v. Uzoefune*, 334 F. App'x 360, 362 (2d Cir. 2009) (finding district court did not err in computing losses by including losses outside the statute of limitations because those losses were "relevant conduct").

Citing the expert report of Gregory Florio ("Florio"), the Defendants allege that Callahan had discretion to withdraw from Kinetics, because the subscription agreements to Diversified Global Investments (BVI), L.P. ("Diversified") granted him the authority to manage Diversified's investments in third-party funds, such as Kinetics. ECF 196-24 ¶ 8. According to the Defendants, Callahan acted pursuant to this authority when he reallocated Diversified's investment in Kinetics to the Panoramic View. *Id.* ¶ 10.

Neither the Defendants in their brief, nor Florio in his expert report, cite anything in the subscription agreements supporting such an unduly broad interpretation of Callahan's authority. The Court disagrees that the abstract delegation of authority to manage Diversified's investments permitted Callahan to misappropriate that money for his own personal gain. Specifically, he diverted investor money from Kinetics, a legitimate investment vehicle, into an interest in the Panoramic View, a real estate venture in which he possessed 50% ownership. ECF 181 ¶ 18. Callahan made those diversions to prevent foreclosure of the Panoramic View by demanding creditors and to further develop the property to his benefit, not to stave off losses to his investors. *Id.* ¶ 20, 31. Callahan, in his personal capacity, retained all of the benefits of this investment, while his investors bore all the risk because their investment was not secured by any property or units at the property. *Id.* ¶ 30. Callahan failed to inform his investors of these diversions; never

obtained their content; and even worse engaged in fraudulent behavior to prevent the discovery of misappropriated Diversified funds. *Id.* ¶¶ 23–28.

The Defendants are also incorrect that the disparity between the estimates in the indictment and at sentencing stem from the value of the market loss in Kinetics. After reducing for any legitimate market losses, the Government estimated that there was a $15 million loss in the Kinetics fund, caused by Callahan's illegal diversion of those funds into the Panoramic View without investor approval. The Defendants' argument that any such losses occurred due to a market phenomenon is wholly unsubstantiated—they cite no evidence supporting that assertion. Even assuming they are correct, it is also the case that Callahan's behavior denied his investors the opportunity to recoup such losses when the fund increased in value after Callahan illegally diverted their money from the Fund.

The Defendants argue that fraud loss does not include future returns. Fraud losses under the Guidelines "shall not include ... [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." U.S.S.G. § 2B1.1 cmt n. 3(D)(i). This rule is inapplicable, because the Court is not affirmatively including the Kinetics' rate of return as part of its estimate. The basis for the amount in the Government's calculation is the principal put into Kinetics by investors. *See Hsu*, 669 F.3d at 121. The reference to rate of return is to merely illustrate that the Defendants cannot justify the diversion of funds from Kinetics on the basis of previous market losses. *See* ECF 158 at 4 ("[I]f the defendant had not improperly and illegally removed investor monies from the Kinetics fund at that time and left the monies in those funds as he was required to do, investors would have lost nothing."). The diversion of a legitimate investment into a self-interested real estate transaction constituted an opportunity-cost precluding investors from recovering their principal. *See Stitsky*,

536 F. App'x at 112 ("The district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because Cobalt investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance.").

Second, the Defendants cite an audit of the Government's calculations by the accounting firm Mazars USA ("Mazars"), supposedly showing that the Government failed to allocate credits to his fraud loss as required. ECF 206-2. The audit is of no value to Defendants. In their own words, Mazars explicitly makes no attempt to calculate the actual financial *losses* to investors. Rather, they merely recalculate the amount of *credits* the Defendants would have received after excluding the investments in Pangea Offshore High Yield Portfolio, LLC ("Pangea") and certain other assets recovered by the Government - $95,541,738. *Id.* ¶ 10. Then, Mazars applies those credits, as well as $3,401,238 in additional credits for the fair market value of hedge fund related services, to arrive at an estimated gain to investors of $2,942,976. *Id.* ¶¶ 12–13.

However, Mazars provides no legal or factual basis for using $96 million as the starting point for applying those credits—a premise already rejected by the Court. By erroneously starting from that number, Mazars significantly underestimates the amount of the actual loss. After excluding the approximately $25.3 million of credits calculated by Mazars from the Government's $140.6 million estimate of the total money received from investors, the total becomes $115.3 million. Applying Mazar's revised estimate of credits to that number leaves approximately $19.7 million in unaccounted for losses—*i.e.*, the exact loss estimated by the Government. Based on the Government's submissions, this number apparently represents unrecovered losses in Pangea. ECF 219 at 8. The Government was entitled to include those losses in its estimate, because they relate to conduct charged in the indictment. ECF 196-4 ¶¶ 14,

19

17. The Defendants' reply that Mazar's calculations accounted for those losses by offsetting the applicable credits is unavailing, because it is readily apparent that the amount of Pangea losses exceeded the amount of credits.

Consequently, the audit amounts to little more than attempt to gerrymander a favorable loss calculation around the Defendants' already debunked theory. It is by no means an accurate or alternative accounting of fraud loss, let alone justification for rejecting the Government's method of estimating losses.

Third, the Defendants argue that the Government failed to break down how it achieved its calculation of the actual loss suffered. However, "[i]n calculating the amount of loss under the Guidelines, a sentencing court 'need only make a reasonable estimate of the loss.'" *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir.2009) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)); *see United States v. Bryant*, 128 F.3d 74, 75 (2d Cir.1997) ("[T]he Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision."). As the Government explained, it "start[ed] from all of the money the defendants took in from investors (not limited to just certain funds in the charged scheme), reduced by all money given back to investors (again, not limited to just certain funds in the charged scheme)." ECF 219 at 8. It is apparent from the parties' submissions that they only differ with respect to whether the money from Kinetics and Pangea should be included in the total amount. Having considered the Defendants' arguments as to those investments, and ruled against them, the Court sees no basis for finding the Government's estimate to be insufficiently detailed.

Fourth, the Defendants argue that the Government's position rests on the erroneous belief that they were not entitled to credits for the net proceeds for the sale of the Panoramic View. The Defendants are incorrect in characterizing the receipt of credits as an entitlement. That would

only have been true if the redemptions occurred before the fraud was detected. *See* U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) (stating that loss should be offset by "money returned, and the fair market value of the property returned and the services rendered, by the defendant ... to the victim before the offense was detected"). Here, the redemptions occurred due to the efforts of the Government after forfeiture of the property. Therefore, whether to credit such redemptions against the actual loss was subject to the discretion of the Court. *See Stitsky*, 536 F. App'x at 111 ("[E]ven if some of Cobalt's properties retained value at the time the fraud was uncovered, as defendants contend, the district court reasonably concluded that the Cobalt securities had no value because there was no realistic possibility that Cobalt would be able to generate a positive return for investors.").

The case relied on by the Defendants, *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008), is inapplicable. *Leonard* "simply holds that a fraudulently induced purchase of certain assets does not cause loss equaling the entire purchase price if the assets actually have some value greater than zero." *Thaler v. United States*, 706 F. Supp. 2d 361, 370 (S.D.N.Y. 2009); *see also United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009) ("In effect, he argues that those amounts should not be counted towards the loss because investors received something of value in exchange for their money. . . . Unlike the cases defendant relies upon, however, defendant's victims were left with nothing of value when the fraud was uncovered."). This case has no bearing on a situation, like here, where at the time the fraud was uncovered investors had lost their entire principal, only to later receive redemptions due to the efforts of the Government.

Finally, the Defendants claim the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose the spreadsheet containing the financial data underlying its loss calculations prior to Callahan's sentencing. The Defendants' *Brady* challenge fails for the same reason their claim that the Government breached the plea agreements fails. ECF 223 at 4 n.1

(describing argument that the "plea agreement is invalid because it was the product of the Government's violation of *Brady v. Maryland*, 373 U.S. 83 (1963)" as "essentially derivative of his arguments regarding the breach of his plea agreement."). Earlier disclosure of the spreadsheet would not have resulted in a different outcome because it is not exculpatory and would not have resulted in a lesser sentence. *See Ukpabi v. United States*, No. 14-cr-00373, 2019 WL 2568758, at *4 (E.D.N.Y. June 20, 2019) (finding alleged failure to disclose lab report in sufficient time before sentencing "was not material to Petitioner because . . . it does not exonerate him and would not have changed the outcome of the proceeding"); *DeCarlo v. United States*, No. 04-cv-1438, 2008 WL 141769, at *3 (E.D.N.Y. Jan. 14, 2008) (finding no *Brady* violation occurred because withheld material was not "favorable" to determination of adjustment to Guidelines calculation).

Therefore, the Court finds that the Government's estimated loss calculation of $19.7 million breaches no reasonable interpretation of the plea agreements.

## B. AS TO THE MOTION TO DISQUALIFY.

"An entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy." *United States v. Basciano*, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011). "In fact, the overwhelming weight of authority counsels against disqualification of an entire U.S. Attorney's Office. Every circuit court that has considered the disqualification of an entire United States Attorney's office has reversed the disqualification." *Id.* at 313 (collecting cases).

For the reasons stated above, the Defendants failed to establish the predicate for their proffered basis for disqualification—a breach of their plea agreements by the Government. Assuming that they established a breach, their extraordinary request would still be entirely

without merit. The motion fails to identify any evidence of bad faith or unethical conduct. *See United States v. Ramirez*, No. 03-cr-1079, 2004 WL 203034, at *3 (S.D.N.Y. Feb. 2, 2004) ("[T]he defendant has provided little more than generalized allegations of an 'air of impropriety.' Such generalized allegations . . . are wholly inadequate to disqualify an entire Office."). The mere specter of civil liability standing alone is insufficient. *See United States v. Heldt*, 668 F.2d 1238, 1276 n.80 (D.C. Cir. 1981) (explaining that in order to obtain disqualification of an Assistant United States Attorney the defendant must provide "proof, by clear and convincing evidence, of a prima facie case of misconduct on the part of the AUSA"). The Defendants have not shown that the Office possesses anything more than "the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Wright v. United States,* 732 F.2d 1048, 1056 (2d Cir.1984).

Therefore, the Court denies the Defendants' motion to disqualify the office of the United States Attorney for the Eastern District of New York.

## C. AS TO THE MOTION TO VACATE CALLAHAN'S SENTENCE.

Callahan moves to vacate his sentence because, allegedly, the Government violated his plea agreement and, relatedly, he suffered from ineffective assistance of counsel in violation of the Sixth Amendment. The Court denies Callahan's motion, first, because he waived his right to appeal his sentence and, second, because it substantively lacks merit.

In his plea agreement, Callahan agreed "not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a terms of imprisonment of 327 months or below." ECF 196-10 ¶ 4. Furthermore, Callahan agreed that "[t]his waiver is binding without regard to the sentencing analysis used by the Court." *Id.* At the plea proceeding, the Court informed Callahan of the

appeal waiver, ECF 222-2 at 9–10, and Callahan acknowledged that he understood that and agreed to the waiver of his right to challenge his sentence. *Id.* at 10.

Where a defendant knowingly and voluntarily waives his appeal and § 2255 rights in a plea agreement and obtains the benefits of the plea agreement, courts should enforce the § 2255 waiver provision and dismiss the petition. *See Garcia-Santos v. United States*, 273 F.3d 506, 508 (2d Cir. 2001) (per curiam). However, a defendant's waiver of his right to appeal will not be enforced if the Government breaches the plea agreement, *United States v. Garcia*, 166 F.3d 519, 521 (2d Cir. 1999), or the plea agreement was itself a product of the ineffective assistance of counsel. *United States v. Reddy*, 527 F. App'x 81, 82 (2d Cir. 2013). Having already ruled that the Government did not violate Callahan's plea agreement, his motion to vacate will only survive if he presents a valid ineffective assistance of counsel claim.

"To evaluate a claim that a guilty plea was involuntary or unknowing due to ineffective assistance of counsel, [courts] use the familiar framework established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001). A defendant must first establish that "counsel's representation fell below an objective standard of reasonableness." *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Second, the defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59, 104 S.Ct. 2052.

"The performance inquiry is contextual; it asks whether defense counsel's actions were objectively reasonable considering all the circumstances. These standards provide at least two benchmarks for the representation of a client who is deciding whether to accept a plea offer." *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000). On the one hand, defense counsel "must

give the client the benefit of counsel's professional advice on this crucial decision" of whether to plead guilty. *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir.1996); *see also Cullen v. United States*, 194 F.3d 401, 404 (2d Cir.1999) ("*Boria* recognizes a lawyer's general duty to advise a defendant concerning acceptance of a plea bargain). As part of this advice, counsel must communicate to the defendant the terms of the plea offer, *see Cullen*, 194 F.3d at 404, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed, *see United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998) ("[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.")

"On the other hand, the ultimate decision whether to plead guilty must be made by the defendant." *Purdy*, 208 F.3d at 45. A lawyer must take care not to coerce a client into either accepting or rejecting a plea offer. *See id.* (quoting *Jones v. Murray*, 947 F.2d 1106, 1111 (4th Cir. 1991) ("[V]arious [ABA] Standards place[ ] upon counsel an affirmative duty to avoid exerting 'undue influence on the accused's decision' and to 'ensure that the decision ... is ultimately made by the defendant.'")).

Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because "[r]epresentation is an art," *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052, and "[t]here are countless ways to provide effective assistance in any given case," *id*. at 689, 104 S.Ct. 2052. "Counsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government),

whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." *Purdy*, 208 F.3d at 45.

Here, the Court finds that its assessment that the Government did not breach Callahan's plea agreement defeats his ineffective assistance of counsel claim. The faults identified with Callahan's representation are only valid if he received a sentence inconsistent with his reasonable expectations. *See* ECF 223 at 4 n.1 (describing Callahan's "ineffective assistance of counsel" argument as "essentially derivative of his arguments regarding the breach of his plea agreement"). As previously discussed, Callahan cannot credibly argue that he pled guilty unknowing of not just the possibility, but likelihood, that he could receive a substantial term of imprisonment.

The fact that Callahan's counsel may have never specifically informed him that the Government could change the estimated size of the Ponzi scheme is immaterial. The underlying assumption of that argument is that utilizing the $96 million estimation he felt entitled to would result in a loss enhancement of $0, and no term of imprisonment. That belief is wholly unjustified and required no additional advice of counsel, because the unreasonableness of that interpretation is plainly apparent from the language of the plea agreement. It is a theory entirely conceived after-the-fact to collaterally attack his sentence, notwithstanding the fact Callahan dressed it up as an ineffective assistance claim. *See Hernandez*, 242 F.3d at 112 ("[T]he district court was entitled to rely upon the defendant's sworn statements . . . that he understood the consequences of his plea, had discussed the plea with his attorney, . . . and had been made no promises except those contained in the plea agreement.").

The Court finds that Callahan's counsel was not ineffective with respect to his guilty plea. Therefore, the appellate waiver is valid, and he cannot challenge his counsel's performance

at sentencing. *See United States v. Djelevic*, 161 F.3d 104, 107 (2d Cir. 1998) ("[D]espite his effort to dress up his claim as a violation of the Sixth Amendment, Pepshi in reality is challenging the correctness of his sentence under the Sentencing Guidelines, and is therefore barred by the plain language of the waiver contained in his plea agreement with the government."). Even if the Court did not enforce the waiver, Callahan's arguments that his counsel was ineffective at sentencing would fail.

First, Callahan argues that his counsel erred by failing to adjourn sentencing, over his objection, after the Government's revelation of its estimate of fraud loss at sentencing. However, this argument relies on the erroneous premise that an adjournment would have resulted in a more desirable outcome. As the Court has already gone to great lengths to explain, the $19.7 million loss estimate advocated by the Government in its pre-sentencing submissions, beyond being entirely consistent with his plea agreement, was overwhelmingly to Callahan's benefit. It resulted in an applicable Guidelines range substantially below the 235 to 293 months estimated in his plea agreement. Had counsel objected, Callahan could have lost his opportunity at a lighter sentence, or even worse, been sentenced to the larger 292 to 365 month sentence initially proposed by Probation.

From the evidence submitted by Callahan, this appears to be exactly the assessment of the circumstances made by his sentencing counsel. In the correspondence cited by Callahan, counsel emphasized that the Government was "seeking a significantly reduced sentence below the guidelines calculation of the Probation Department and the Plea Agreement," as well as the fact that an adjournment might result in the introduction of harmful evidence and a lengthier sentence. ECF 196-21 at 1. Although counsel may have been in error to inform Callahan that he "skimmed" the Government's submission "quickly," his strategic decision to forego an

adjournment was neither unreasonable nor prejudicial to Callahan. *See United States v. Prince*, 110 F.3d 921, 926 (2d Cir. 1997) (finding "defense counsel's decision not to seek an adjournment of the sentencing was a reasonable exercise of professional judgment in light of the circumstances" because "[a] delay of the sentencing might have caused the court to change its views" unfavorably).

Second, Callahan argues that his counsel erred by failing to consult an expert regarding the investments in Kinetics. Of note, Callahan's counsel raised the argument that any loss from Kinetics should not be included in the loss calculation, which the Court rejected. ECF 159; ECF 222-3 at 11–13, 15, 44–46, 62. Just like Callahan's desire to obtain an adjournment of sentencing, the Court disagrees that the failure to retain an expert was unreasonable and prejudicial.

The cases relied on by Callahan are inapposite, because they involved the very narrow issue of rebutting direct evidence of victim testimony in sexual abuse cases. *See Schlesinger v. United States*, 898 F. Supp. 2d 489, 513–14 (E.D.N.Y. 2012) (Spatt, J.) ("[B]ecause the circumstantial evidence supporting the arson conviction did not solely rely on direct evidence of victim testimony, this case is distinguishable from *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir.2001), *Eze v. Senkowski*, 321 F.3d 110 (2d Cir.2003), and *Pavel v. Hollins*, 261 F.3d 210 (2d Cir.2001)."); *Bloomfield v. Senkowski*, No. 02-cv-6738, 2008 WL 2097423, at *35 (E.D.N.Y. May 15, 2008) ("These three cases hold that the failure to consult with or to call a medical experts in child sexual abuse cases, in combination with other deficiencies, can amount to ineffective assistance.").

The question here—whether the Court should have considered losses attributable to Kinetics—is a legal dispute concerning the proper interpretation of Diversified's subscription

agreements. It involves none of the technical or scientific considerations that would normally warrant expert testimony, and the Government did not introduce any expert evidence requiring rebuttal. *See Schlesinger*, 898 F. Supp. 2d at 513–15 (describing numerous differences between expert testimony in *Lindstadt*, *Eze*, and *Pavel* with arson conviction); *Affser v. Murray*, No. 04-cv-2715, 2008 WL 2909367, at *5 (E.D.N.Y. July 28, 2008) (explaining expert testimony was unnecessary in case involving mere inappropriate touching, with no forensic evidence of sexual abuse). Counsel's decision to call witnesses on behalf of a defendant "is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987). Callahan's objection "amount[s] to little more than a roving, superficial critique of [sentencing] counsel's strategy." *Constant v. Martuscello*, 119 F. Supp. 3d 87, 147–48 (E.D.N.Y. 2015) (rejecting argument that defendant suffered ineffective assistance of counsel due to trial counsel's "refus[al] to call an expert witness in his defense").

Therefore, the Court denies Callahan's motion to vacate his sentence.

## D.  AS TO THE MOTION TO PRECLUDE OSTRY FROM TESTIFYING.

Manson seeks to preclude Ostry from testifying at his sentencing hearing or, in the alternative, to permit cross-examination of Ostry by his counsel. In sum, Manson alleges that Ostry intended to submit false personal attacks in furtherance of a civil lawsuit against the Defendants in Nassau County Supreme Court. The Court grants Manson's alternative request.

Sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure[ ] that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984)); *see also United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013). This inquiry

is "largely unlimited ... as to the kind of information ... consider[ed], or the source from which it may come." *Witte v. United States*, 515 U.S. 389, 398, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (internal citations and quotation marks omitted). Indeed, the Court "may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment[,] and criminal activity resulting in an acquittal in determining sentence." *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)).

Accordingly, the Court sees no reason to exclude Ostry's testimony. To the extent that he offers false or misleading testimony, the Court will not rely on it in fashioning Manson's sentence. In that regard, the Court will permit cross-examination by defense counsel to facilitate its assessment of Ostry's credibility. *See Romano*, 825 F.2d at 729 ("[A] defendant may challenge pre-sentence information by offering written submissions, directing argument to the court or cross-examining witnesses.").

## III. CONCLUSION

For the foregoing reasons, the Court denies the Defendants' motions in their entirety, except that the Court will permit cross-examination of Ostry at Manson's sentencing hearing.

As to Callahan's motion to vacate, the Court declines to issue a certificate of appealability because he has not made a substantial showing that he was denied a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

It is **SO ORDERED**:

Dated: Central Islip, New York

      January 9, 2019

                                                  __/s/ Arthur D. Spatt____

                                                 ARTHUR D. SPATT

                                                 United States District Judge